AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO (AFSCME), et al., Plaintiffs-Appellees,

v.

STATE OF WASHINGTON, et al., Defendants-Appellants.

AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO (AFSCME), et al., Plaintiffs-Appellants,

v.

STATE OF WASHINGTON, et al., Defendants-Appellees.

Nos. 84–3569, 84–3590.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 1985.

Decided Sept. 4, 1985.

Richard B. Sanders, Seattle, Wash., Daniel J. Popeo, George C. Smith, Washington, D.C., for Washington Legal Foundation.

Robert E. Williams, Thomas R. Bagby, Douglas S. McDowell, McGuiness & Williams, Washington, D.C., for Equal Employment Advisory Council.

Daniel E. Leach, Chadbourne, Parke, Whiteside & Wolff, Washington, D.C., Chadbourne, Parke, Whiteside & Wolff, Peter N. Hillman, New York City, for Washington Study Group.

Clint Bolick, K. Preston Oade, Jr., Maxwell A. Miller, Mountain States Legal Foundation, Denver, Colo., for Mountain States Legal Foundation.

Ronald A. Zumbrun, John H. Findley, Anthony T. Caso, Pacific Legal Foundation, Sacramento, Cal., for Pacific Legal Foundation.

* Honorable Thomas J. MacBride, Senior U.S. District Judge for the Eastern District of California,

Davis, Wright, Todd, Riese & Jones, Thomas A. Lemly, Stephen M. Rummage, Robert G. Homchick, Seattle, Wash., for Asso. of Washington Business.

Winn, Newman & Associates, Winn Newman, Lisa Newell, Richard B. Sobol, Michael B. Trister, Washington, D.C., Cordes, Cordes & Younglove, Ed Younglove, Olympia, Wash., for AFSCME.

Christine O. Gregoire, Deputy Atty. Gen., Richard A. Heath, Sr., Asst. Atty. Gen., Olympia, Wash., for State of Wash.

Epstein, Becker, Borsody & Green, Frank C. Morris, Jr., Washington, D.C., for Eagle Forum Educ. & Legal Defense Fund, amicus.

Edith Barnett, Washington, D.C., for Nat. Center for Econmic Alternatives, amicus.

Mary L. Heen, Isabelle Katz Pinzler, Joan E. Bertin, E. Richard Larson, Burt Neuborne, New York City, Durning, Webster & Lonnquist, Judith A. Lonnquist, Seattle, Wash., for Nat. Committee on Pay Equity, et al., amicus.

Robert H. Chanin, Washington, D.C., Altshuler & Berzon, Marsha S. Berzon, San Francisco, Cal., Laurence Gold, Washington, D.C., for American Federation of Labor & Congress of Indus. Organizations, amicus.

Julius LeVonne Chambers, Barry L. Goldstein, Gail J. Wright, Charles Stephen Ralston, Penda D. Hair, New York City, for NAACP Legal Defense & Educational Fund, Inc., amicus.

Marsha Levick, Emily Spitzer, New York City, for Women & The NOW Legal Defense & Educ. Fund, amicus.

Before WRIGHT and KENNEDY, Circuit Judges, and MacBRIDE,* District Judge.

sitting by designation.

KENNEDY, Circuit Judge:

In this class action affecting approximately 15,500 of its employees, the State of Washington was sued in the United States District Court for the Western District of Washington. The class comprises state employees who have worked or do work in job categories that are or have been at least seventy percent female. The action was commenced for the class members by two unions, the American Federation of State, County, and Municipal Employees (AFSCME) and the Washington Federation of State Employees (WFSE). In all of the proceedings to date and in the opinion that follows, the plaintiffs are referred to as AFSCME. The district court found the State discriminated on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (1982), by compensating employees in jobs where females predominate at lower rates than employees in jobs where males predominate, if these jobs, though dissimilar, were identified by certain studies to be of comparable worth. The State appeals. We conclude a violation of Title VII was not established here, and we reverse.

The State of Washington has required salaries of state employees to reflect prevailing market rates. See Wash.Rev.Code Ann. § 28B.16.100(16) (1983) (effective March 29, 1979); State Civil Service Law, ch. 1, § 16, 1961 Wash.Laws 7, 17. Throughout the period in question, comprehensive biennial salary surveys were conducted to assess prevailing market rates. The surveys involved approximately 2,700 employers in the public and private sectors. The results were reported to state personnel boards, which conducted hearings before employee representatives and agencies and made salary recommendations to the State Budget Director. The Director submitted a proposed budget to the Governor, who in turn presented it to the state legislature. Salaries were fixed by enactment of the budget.

In 1974 the State commissioned a study by management consultant Norman Willis to determine whether a wage disparity existed between employees in jobs held predominantly by women and jobs held predominantly by men. The study examined sixty-two classifications in which at least seventy percent of the employees were women, and fifty-nine job classifications in which at least seventy percent of the employees were men. It found a wage disparity of about twenty percent, to the disadvantage of employees in jobs held mostly by women, for jobs considered of comparable worth. Comparable worth was calculated by evaluating jobs under four criteria: knowledge and skills, mental demands, accountability, and working conditions. A maximum number of points was allotted to each category: 280 for knowledge and skills, 140 for mental demands, 160 for accountability, and 20 for working conditions. Every job was assigned a numerical value under each of the four criteria. The State of Washington conducted similar studies in 1976 and 1980, and in 1983 the State enacted legislation providing for a compensation scheme based on comparable worth. The scheme is to take effect over a ten-year period. Act of June 15, 1983, ch. 75, 1983 Wash.Laws 1st Ex.Sess. 2071.

AFSCME filed charges with the Equal Employment Opportunity Commission (EEOC) in 1981, alleging the State's compensation system violated Title VII's prohibition against sex discrimination in employment. The EEOC having taken no action, the United States Department of Justice issued notices of right to sue, expressing no opinion on the merits of the claims. In 1982 AFSCME brought this action in the district court, seeking immediate implementation of a system of compensation based on comparable worth. The district court ruled in favor of AFSCME and ordered injunctive relief and back pay. Its findings of fact, conclusions of law, and opinion are reported. *American Federation of State, County, and Municipal Employees v. Washington*, 578 F.Supp. 846 (W.D.Wash. 1983) (*AFSCME I*).

AFSCME alleges sex-based wage discrimination throughout the state system, but its explanation and proof of the viola-

tion is, in essence, Washington's failure as early as 1979 to adopt and implement at once a comparable worth compensation program. The trial court adopted this theory as well. *AFSCME I,* 578 F.Supp. at 865–71. The comparable worth theory, as developed in the case before us, postulates that sex-based wage discrimination exists if employees in job classifications occupied primarily by women are paid less than employees in job classifications filled primarily by men, if the jobs are of equal value to the employer, though otherwise dissimilar. *See, e.g.,* Jacobs, *Comparable Worth,* Case & Com., March-April 1985, at 12; Bellak, *Comparable Worth: A Practitioner's View,* in 1 Comparable Worth: Issue for the 80's, at 75 (United States Commission on Civil Rights, June 6–7, 1984); Northrup, *Comparable Worth and Realistic Wage Setting,* in 1 Comparable Worth: Issue for the 80's, at 93 (United States Commission on Civil Rights, June 6–7, 1984), *see also American Nurses' Association v. Illinois,* 606 F.Supp. 1313, 1315 (N.D.Ill.1985) (mem.). We must determine whether comparable worth, as presented in this case, affords AFSCME a basis for recovery under Title VII.

Section 703(a) of Title VII states in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ... or

(2) to limit, segregate, or classify his employees or applicants for employment in any way *which would deprive or tend to deprive any individual of employment opportunities* ... because of such individual's ... sex....

42 U.S.C. § 2000e–2(a) (1982) (emphasis added).

The Bennett Amendment to Title VII, designed to relate Title VII to the Equal Pay Act[1], *see County of Washington v. Gunther,* 452 U.S. 161, 173–76, 101 S.Ct. 2242, 2249–51, 68 L.Ed.2d 751 (1981), and eliminate any potential inconsistencies between the two statutes, provides:

It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.

42 U.S.C. § 2000e–2(h) (1982). It is evident from the legislative history of the Equal Pay Act that Congress, after explicit consideration, rejected proposals that would have prohibited lower wages for comparable work, as contrasted with equal work. *See* 109 Cong.Rec. 9197–9208 (Remarks of Rep. Goodell), 9196 (Remarks of Rep. Frelinghuysen), 9197–98 (Remarks of Reps. Griffin and Thompson) (1963). The legislative history of the Civil Rights Act of 1964 and the Bennett Amendment, however, is inconclusive regarding the intended coverage of Title VII's prohibition against sex discrimination, and contains no explicit discussion of compensation for either comparable or equal work. *See generally General Electric Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) ("[t]he legislative history of Title VII's prohibition of sex discrimination is notable primarily for its brevity"). The Supreme Court in *Gunther,* stressing the broad remedial purposes of Title VII, construed the Bennett Amendment to incorporate into Title VII the four affirmative defenses of the Equal Pay Act, but not to limit discrimina-

---

1. The Equal Pay Act provides in relevant part: No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort,

and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1) (1982).

tion suits involving pay to the cause of action provided in the Equal Pay Act. 452 U.S. at 168–71, 101 S.Ct. at 2247–49. The Court noted, however, that the case before it did not involve the concept of comparable worth, *id.* at 166, 101 S.Ct. at 2246, and declined to define "the precise contours of lawsuits challenging sex discrimination in compensation under Title VII." *Id.* at 181, 101 S.Ct. at 2254.

 In the instant case, the district court found a violation of Title VII, premised upon both the disparate impact and the disparate treatment theories of discrimination. *AFSCME I,* 578 F.Supp. at 864. Under the disparate impact theory, discrimination may be established by showing that a facially neutral employment practice, not justified by business necessity, has a disproportionately adverse impact upon members of a group protected under Title VII. *See Dothard v. Rawlinson,* 433 U.S. 321, 328–29, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Proof of an employer's intent to discriminate in adopting a particular practice is not required in a disparate impact case. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Spaulding v. University of Washington,* 740 F.2d 686, 705 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). The theory is based in part on the rationale that where a practice is specific and focused we can address whether it is a pretext for discrimination in light of the employer's explanation for the practice. Under the disparate treatment theory, in contrast, an employer's intent or motive in adopting a challenged policy is an essential element of liability for a violation of Title VII. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (proof of discriminatory motive is critical to establish a prima facie case of discrimination in a treatment case); *Spaulding,* 740 F.2d at 700; *Heagney v. University of Washington,* 642 F.2d 1157, 1163 (9th Cir.1981). It is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show the employer was merely aware of the adverse consequences the policy would have on a protected group. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (discriminatory purpose implies more than awareness of consequences). The plaintiff must show the employer chose the particular policy because of its effect on members of a protected class. *Id.* (discriminatory intent implies selection of a particular course of action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (plaintiff must allege the employer "treats some people less favorably than others because of their race, color, religion, sex, or national origin"). We consider each theory of liability in turn. Though there are both questions of fact and law in the district court's opinion, the result we reach is the same under either the clearly erroneous or the *de novo* standard of review. *See Spaulding,* 740 F.2d at 699. We begin by reviewing the district court's judgment in favor of AFSCME under the disparate impact theory.

 The trial court erred in ruling that liability was established under a disparate impact analysis. The precedents do not permit the case to proceed upon that premise. AFSCME's disparate impact argument is based on the contention that the State of Washington's practice of taking prevailing market rates into account in setting wages has an adverse impact on women, who, historically, have received lower wages than men in the labor market. Disparate impact analysis is confined to cases that challenge a specific, clearly delineated employment practice applied at a single point in the job selection process. *Atonio v. Wards Cove Packing Co.,* 768 F.2d 1120, 1130 (9th Cir.1985); *see also Dothard,* 433 U.S. at 328–29, 97 S.Ct. at 2726–27 (height and weight requirement disproportionately excluded women); *Griggs,* 401 U.S. at 430–31, 91 S.Ct. at 853–54 (require-

ment of high school diploma or satisfactory performance on standardized tests disproportionately affected minorities); *Harriss v. Pan American World Airways, Inc.*, 649 F.2d 670, 674 (9th Cir.1980) (policy mandating maternity leave immediately upon learning of pregnancy had an adverse impact on women); *Gregory v. Litton Systems*, 472 F.2d 631, 632 (9th Cir.1972) (policy excluding applicants with arrest records adversely affected minorities). The instant case does not involve an employment practice that yields to disparate impact analysis. As we noted in an earlier case, the decision to base compensation on the competitive market, rather than on a theory of comparable worth, involves the assessment of a number of complex factors not easily ascertainable, an assessment too multifaceted to be appropriate for disparate impact analysis. *Spaulding*, 740 F.2d at 708. In the case before us, the compensation system in question resulted from surveys, agency hearings, administrative recommendations, budget proposals, executive actions, and legislative enactments. A compensation system that is responsive to supply and demand and other market forces is not the type of specific, clearly delineated employment policy contemplated by *Dothard* and *Griggs;* such a compensation system, the result of a complex of market forces, does not constitute a single practice that suffices to support a claim under disparate impact theory. *See Spaulding*, 740 F.2d at 708; *see also Atonio*, at 1129 (broad scale attacks against a wide range of ill-defined employment practices are inappropriate for disparate impact analysis); *Pouncy v. Prudential Insurance Co.*, 668 F.2d 795, 800–01 (5th Cir.1982) (disparate impact model is ill-suited for application to wide-ranging challenges to general compensation policies). Such cases are controlled by disparate treatment analysis. Under these principles and precedents, we must reverse the district court's determination of liability under the disparate impact theory of discrimination.

■ We consider next the allegations of disparate treatment. Under the disparate treatment theory, AFSCME was required to prove a prima facie case of sex discrimination by a preponderance of the evidence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Spaulding*, 740 F.2d at 700. As previously noted, liability for disparate treatment hinges upon proof of discriminatory intent. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Spaulding*, 740 F.2d at 700; *Heagney*, 642 F.2d at 1163. In an appropriate case, the necessary discriminatory animus may be inferred from circumstantial evidence. *Furnco*, 438 U.S. at 579–80, 98 S.Ct. at 2950–51 (discriminatory intent may be inferred from the actions of an employer where "experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations"); *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Our review of the record, however, indicates failure by AFSCME to establish the requisite element of intent by either circumstantial or direct evidence.

■ AFSCME contends discriminatory motive may be inferred from the Willis study, which finds the State's practice of setting salaries in reliance on market rates creates a sex-based wage disparity for jobs deemed of comparable worth. AFSCME argues from the study that the market reflects a historical pattern of lower wages to employees in positions staffed predominantly by women; and it contends the State of Washington perpetuates that disparity, in violation of Title VII, by using market rates in the compensation system. The inference of discriminatory motive which AFSCME seeks to draw from the State's participation in the market system fails, as the State did not create the market disparity and has not been shown to have been motivated by impermissible sex-based considerations in setting salaries.

The requirement of intent is linked at least in part to culpability, *see Spaulding* at 708; *Contreras v. City of Los Angeles,* 656 F.2d 1267, 1275 n. 5 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). That concept would be undermined if we were to hold that payment of wages according to prevailing rates in the public and private sectors is an act that, in itself, supports the inference of a purpose to discriminate. Neither law nor logic deems the free market system a suspect enterprise. Economic reality is that the value of a particular job to an employer is but one factor influencing the rate of compensation for that job. Other considerations may include the availability of workers willing to do the job and the effectiveness of collective bargaining in a particular industry. *Christensen v. Iowa,* 563 F.2d 353, 356 (8th Cir.1977). We recognized in *Spaulding* that employers may be constrained by market forces to set salaries under prevailing wage rates for different job classifications, 740 F.2d at 708. We find nothing in the language of Title VII or its legislative history to indicate Congress intended to abrogate fundamental economic principles such as the laws of supply and demand or to prevent employers from competing in the labor market. *See Lemons v. Denver,* 620 F.2d 228, 229 (10th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); *Christensen,* 563 F.2d at 356.

While the Washington legislature may have the discretion to enact a comparable worth plan if it chooses to do so, Title VII does not obligate it to eliminate an economic inequality that it did not create. *See Lemons,* 620 F.2d at 229 (this type of wage disparity, generated by market forces, was not sought to be remedied by the Civil Rights Act and is not within the scope of the equal protection clause); *Christensen,* 563 F.2d at 355–56 (same); *Briggs v. Madison,* 536 F.Supp. 435, 447 (W.D.Wis.1982) (same). Title VII was enacted to ensure equal opportunity in employment to covered individuals, *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. at 1823; *Christensen,* 563 F.2d at 356, and the State of Wash-

ington is not charged here with barring access to particular job classifications on the basis of sex. *See Lemons,* 620 F.2d at 230; *Christensen,* 563 F.2d at 356.

We have recognized that in certain cases an inference of intent may be drawn from statistical evidence. *Spaulding,* 740 F.2d at 703; *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1342 (9th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982); *accord, Teamsters,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57. We have admonished, however, that statistics must be relied on with caution. *Spaulding,* 740 F.2d at 703. Though the comparability of wage rates in dissimilar jobs may be relevant to a determination of discriminatory animus, *id.* at 700–01, job evaluation studies and comparable worth statistics alone are insufficient to establish the requisite inference of discriminatory motive critical to the disparate treatment theory. *Id.* at 703 (circumstantial statistical evidence alone is insufficient to establish an inference of discriminatory intent in a disparate treatment case). The weight to be accorded such statistics is determined by the existence of independent corroborative evidence of discrimination. *Teamsters,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57 (statistics are most useful when supplemented with testimony of specific incidents of discrimination); *Spaulding,* 740 F.2d at 703; *White v. City of San Diego,* 605 F.2d 455, 460 (9th Cir.1979); *United States v. Iron Workers Local 86,* 443 F.2d 544, 551 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). We conclude the independent evidence of discrimination presented by AFSCME is insufficient to support an inference of the requisite discriminatory motive under the disparate treatment theory.

AFSCME offered proof of isolated incidents of sex segregation as evidence of a history of sex-based wage discrimination. The evidence is discussed in *AFSCME I,* 578 F.Supp. at 860, and consists of "help wanted" advertisements restricting various jobs to members of a particular sex. These advertisements were often placed in sepa-

rate "help wanted—male" and "help wanted—female" columns in state newspapers between 1960 and 1973, though most were discontinued when Title VII became applicable to the states in 1972. At trial, AFSCME called expert witnesses to testify that a causal relationship exists between sex segregation practices and sex-based wage discrimination, and that the effects of sex segregation practices may persist even after the practices are discontinued. However, none of the individually named plaintiffs in the action ever testified regarding specific incidents of discrimination. The isolated incidents alleged by AFSCME are insufficient to corroborate the results of the Willis study and do not justify an inference of discriminatory motive by the State in the setting of salaries for its system as a whole. Given the scope of the alleged intentional act, and given the attempt to show the core principle of the State's market-based compensation system was adopted or maintained with a discriminatory purpose, more is required to support the finding of liability than these isolated acts, which had only an indirect relation to the compensation principle itself.

We also reject AFSCME's contention that, having commissioned the Willis study, the State of Washington was committed to implement a new system of compensation based on comparable worth as defined by the study. Whether comparable worth is a feasible approach to employee compensation is a matter of debate. *See generally* Comparable Worth: Issue for the 80's (United States Commission on Civil Rights, Vols. 1 and 2, June 6–7, 1984); Vieira, *Comparable Worth and the Gunther Case: The New Drive for Equal Pay*, 18 U.C.D.L.Rev. 449 (1985); Levit & Mahoney, *The Future of Comparable Worth Theory*, 56 U.Colo.L.Rev. 99 (1984); Comment, *The Comparable Worth Dilemma: Are Apples and Oranges Ripe for Comparison?*, 37 Baylor L.Rev. 227 (1985). Assuming, however, that like other job evaluation studies it may be useful as a diagnostic tool, we reject a rule that would penalize rather than commend employers for their effort and innovation in undertaking such a study. *See American Nurses' Association*, 606 F.Supp. at 1317–18 (a rule requiring implementation of results of job evaluation studies would deter employers from conducting such studies). The results of comparable worth studies will vary depending on the number and types of factors measured and the maximum number of points allotted to each factor. A study that indicates a particular wage structure might be more equitable should not categorically bind the employer who commissioned it. The employer should also be able to take into account market conditions, bargaining demands, and the possibility that another study will yield different results. *Id.* at 1318. *Cf. Gunther*, 452 U.S. at 180–81, 101 S.Ct. at 2253–54 (once an employer decided to adopt a particular job evaluation system, it could not be applied inconsistently).

We hold there was a failure to establish a violation of Title VII under the disparate treatment theory of discrimination, and reverse the district court on this aspect of the case as well. The State of Washington's initial reliance on a free market system in which employees in male-dominated jobs are compensated at a higher rate than employees in dissimilar female-dominated jobs is not in and of itself a violation of Title VII, notwithstanding that the Willis study deemed the positions of comparable worth. Absent a showing of discriminatory motive, which has not been made here, the law does not permit the federal courts to interfere in the market-based system for the compensation of Washington's employees.

Certain procedural errors were committed by the district court, including misallocating the burdens of proof and precluding the State from presenting much of its evidence. Though these errors complicate our review of the record unnecessarily, they need not be addressed, given our disposition on the merits of the case.

REVERSED.