384 F.Supp. 1246 (1974)
Samuel M. KAYNARD, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,
v.
NASSAU DISTRICT COUNCIL OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Respondent.
No. 74C 1489.
United States District Court, E. D. New York.
November 12, 1974.
*1247 Samuel Kaynard, Regional Director, NLRB, Brooklyn, N. Y., for petitioner.
Delson & Gordon, New York City, for respondent.

Memorandum
PLATT, District Judge.
Petitioner seeks an injunction under Section 10(l) of the National Labor Relations Act, as amended (29 U.S.C. § 160(l) ("the Act") claiming, inter alia, that respondent has engaged, and is engaging, in acts and conduct in violation of § 8(b)(4)(i), (ii), subsections (B) and (D) of the Act (29 U.S.C. § 158(b) (4)(i), (ii), subsections (B) and (D)).
On October 3 and 7, 1974, pursuant to the provisions of the Act, Alexander's, Inc. filed charges with the National Labor Relations Board "the Board"), alleging, among other things, that respondent has engaged, and is engaging, in unfair labor practices within the meaning of the above cited sections of the Act. Such charges were referred to petitioner as Regional Director of Region 29 of the Board.
Petitioner claims it has reasonable cause to believe that said charges are true, and that a complaint of the Board based on the subsection (B) charge should issue against respondent pursuant to § 10(b) of the Act and that a notice of hearing based on the subsection (D) charge should issue pursuant to § 10(k) of the Act.
Alexander's, Inc., maintains and operates a department store at Roosevelt Field, Garden City, New York ("the Roosevelt Field store") and other department stores located at various other locations throughout the Metropolitan area where it is engaged in the retail sale of furniture, clothing, drugs, toys and other products. Alexander's, Inc., and respondent have been parties to a collective bargaining agreement effective May 1, 1973, to and including April 30, 1975, which covers the terms and conditions of employment of the maintenance carpenter employed from the opening of the Roosevelt Field store in 1971 up to September 13, 1974.
In and about March 1974, as the result of an ongoing study, Alexander's reached the conclusion that it should, because of economic reasons, reduce the staffs of various departments, including the maintenance carpenters employed in its various stores. Up to that point Alexander's had employed a carpenter in every store and it determined that if it contracted such work to an independent company, it could fulfill its carpenter requirements with one carpenter for every two stores.
Accordingly, Alexander's negotiated, and executed on September 10, 1974, a contract with Aviva Maintenance Corporation to perform carpentry work at all of its various locations. Immediately thereafter it sent telegrams to all of its affected local unions stating "Due to economic reasons requiring reduction of force, all full-time carpenters will be laid off effective September 13".
In accordance therewith, on September 13, 1974, the maintenance carpenter at the Roosevelt Field store, Harry Curcurto, was terminated, along with all other maintenance carpenters at Alexander's other stores.
Soon after the dispatch of the aforesaid telegram Alexander's industrial relations director, Burl Michelson, received *1248 a telephone call from John G. Rosenstron, the secretary and business manager of the respondent, in which Mr. Michelson explained the reasons for the action and during which Mr. Rosenstron made no request to bargain and did not say anything about Mr. Harry Curcurto.
On September 23, Aviva Maintenance Corporation assigned one of its carpenters, James Cerasoli, to Alexander's, Inc. Roosevelt Field store "to remove an existing dressing room and to relocate it at another area of the store" and after about an hour and fifteen minutes of work a business agent for the respondent asked him "to stop work on the grounds that Aviva Maintenance didn't have a contract with" respondent. As a result, Mr. Cerasoli did not perform any more services on that day and was told by his employer to leave the store.
In the early morning of October 3, 1974, on his arrival at the Roosevelt Field store, Mr. Michelson observed "a group of men carrying picket signs in front of our employees entrance, such signs bearing the legend: `To the public: the employees of Alexander's  Roosevelt Field don't receive wages and working conditions established by the Nassau District Council of Carpenters'". Mr. Michelson spoke to two operating engineers and one electrician who were "waiting for some direction as far as the reporting to work was concerned" and remembers "seeing Mr. Curcurto there. He was carrying a picket sign."
In the early afternoon Mr. Michelson conferred with Mr. Mervin Hartigan, president of the respondent, in a restaurant on the mall at Roosevelt Field in the presence of two corporate executives of Alexander's and a Mr. John Sullivan, a business agent of the operating engineers.
At such conference Mr. Hartigan told Mr. Michelson "that if Aviva Maintenance did not have a contract with the Nassau Council of Carpenters, that he didn't respect the contract which Aviva held with the New York Joint Council of Carpenters, that we were * * * using stockmen, stockboys to do carpenters work and * * * suggested to me that we use  and he * * * listed several other companies with whom the Nassau Council had contractual relations * * *. He then said that if we use any of these listed contractors, our problems would be resolved.

* * * * * *
"He spoke about Harry Curcurto coming back to work * * * [and] indicated to me that the Nassau District Council would determine whether or not men were proficient enough to work in our store."
In the words of Mr. Donald Madsen, maintenance manager of Alexander's, Inc., "Mr. Hartigan also said to Mr. Michelson that he would determine what carpenter would work for whatever contractor we used."
At an earlier meeting on September 25, 1974, Mr. Ronald Kremens, secretary-treasurer of Aviva Maintenance corporation, met with Mr. Hartigan in the office of the respondent. Mr. Rosenstron advised Mr. Kremens that he would have to employ Mr. Curcurto, otherwise the Nassau District Council would not sign an agreement with Aviva. Again on October 3, 1974, Mr. Kremens met with Mr. Hartigan outside the mall at Roosevelt Field and was advised "in essence that it (the picketing) would be solved if I hired Mr. Curcurto".
All of such testimony was uncontradicted.
The undisputed testmony also shows that while the engineers and electrician returned to work on October 4th the picketing has continued on a daily basis in front of the mall entrance and at the south entrance, the employees entrance and the platform area. The picketing has resulted in a number of delivery stoppages and delays. More specifically, Alexander's has been unable to obtain carpentry services necessary to create its customary Christmas displays and time is rapidly becoming of the essence in this respect.
*1249 The narrow questions for this Court on petitioner's motion are whether the Board had reasonable cause to believe that respondent has engaged, and is engaging, in unfair labor practices within the meaning of Section 8(b)(4)(i), (ii), subsections (B) and (D) of the Act and whether petitioner need show that substantial and irreparable injury to Alexander's will be unavoidable or need only show that injunctive relief is "just and proper" and whether petitioner has sustained the appropriate burden.
The pertinent portions of Section 8 of the Act provide as follows:
"(b) It shall be an unfair labor practice for a labor organization or its agents 
* * * * * *
(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
* * * * * *
(B) forcing or requiring any person * * * to cease doing business with any other person * * *
* * * * * *
(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work".
The Board found the object and purpose of the picketing, and threat to picket, by the respondent "was and is (1) to force and require Alexander's and other persons to cease doing business with Aviva; (2) to force and require Alexander's to assign the performance of moving display tables, gondolas and other fixtures at its Roosevelt Field store to individuals who are members of or who are represented by respondent; and (3) to force and require Alexander's to assign the performance of maintenance carpentry work at its Roosevelt Field store to individuals who are members of or who are represented by respondent" and that such acts and conduct constituted unfair labor practices within the meaning of the above quoted portions of the Act.
The record amply supports petitioner's claim and there is nothing therein which contradicts or refutes the same. Accordingly, the Court has no difficulty in finding that the Board had reasonable cause to believe that respondent has engaged and is engaging in unfair labor practices in violation of the above quoted portions of the Act.
The second question is somewhat more difficult, namely, whether petitioner must show that the charging party (Alexander's) will sustain substantial and irreparable injury unless an injunction is issued.
The Court of Appeals for this Circuit has recently said that "the Supreme Court has not yet passed upon the criteria for granting a preliminary injunction under either Section 10(j) or 10 (l)" and, in that case, expressly declined to decide "whether irreparable harm to the Employer must always be shown in a Section 10(l) case." Danielson v. Local 275, Laborers Int. U. of Nor. Amer., 479 F.2d 1033, 1035-1036 (2d Cir. 1973).
In that case the Court did state the law in this Circuit to be (479 F.2d at pp. 1035, 1036):
"In § 10(l) proceedings the function of the federal district court consists of determining (1) whether the temporary injunctive relief would be `just and proper' in terms *1250 of general equitable principles and (2) whether there is `reasonable cause' for the Regional Director `to believe such [unfair labor practice] charge is true and that a complaint should be issued.'
We see no reason here to depart from this statement of the law. Section 10(l) in haec verba provides that the District Court shall have jurisdiction to grant such injunctive relief `as it deems just and proper.' The Section therefore does not mandate the preliminary injunction simply because the District Court concludes that the Regional Director has reasonable ground to believe that an unfair labor practice has occurred. The Act gives the Court discretion by employing the `just and proper' language. See United Brotherhood of Carpenters & Joiners v. Sperry, 170 F.2d 863, 869 (10th Cir. 1948). In Local 25, supra [McLeod v. Local 25, IBEW, 344 F.2d 634 (2d Cir. 1965)], our Court simply held that in applying the `just and proper' norm the District Court should be guided by the application of general equitable principles. We see no impropriety in this since the District Court albeit authorized by the statute to grant injunctive relief, is exercising its equity powers."
The words "general equitable principles" would not necessarily seem to import or include a showing of substantial and irreparable harm, although, of course, such a showing would affect any case which was to be decided on such principles.
In short, the term "general equitable principles" would seem to have been derived from and would appear to equate to the words "just and proper" in the Act.
Thus it would appear that the Court of Appeals at least up to this point is merely observing the different statutory test prescribed on the one hand for a temporary restraining order and on the other for a preliminary injunction. The pertinent portion of the Act provides:
"Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: Provided further, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable."
Under normal rules of statutory construction, allegations and a showing of substantial and irreparable injury to the charging party would only be necessary in an application for a temporary restraining order. In all other applications for injunctive relief the statutory requirement apparently is only that the Court grant such relief "as it deems just and proper".
This construction of the Act has also been adopted by the United States Court of Appeals for the District of Columbia in International Union UAW v. NLRB, 145 U.S.App.D.C. 384, 449 F.2d 1046, 1051 (1971).
It is pertinent therefore to inquire what elements may be considered in determining whether injunctive relief is "just and proper".
In the Local 275 case, supra, the Court of Appeals for this Circuit made it clear that the Act cannot be read to imply "that anything less than a total work stoppage does not amount to irreparable injury" (479 F.2d at p. 1036) and that it would not be right "to withhold equitable relief simply because picketing has failed to shut down the operation but only delays performance which results in the incurring of expenses and prevention of profits" (479 F.2d at p. 1073). The Court also said that "a basic purpose of preliminary injunction is to maintain the status quo. Exxon Corp. v. City of New York, 480 F.2d 460 (2d Cir. 1973)" and that "the failure to issue an injunction * * * maintains *1251 not the status quo, but protects what the Court below has found the Regional Director had reasonable ground to believe, is a violation of the statute." (479 F.2d at p. 1037). The Court then indicated that what it meant by "general equitable principles" may be a balancing of the equities or a weighing of the hardships, for it states that "we fail to see how there is any possible weighing of hardships in favor of the Unions" (479 F.2d at p. 1037).
In this Court's opinion, if an injunction is issued in the case at bar there would be no, or at best minimal hardship to the Union. It is true that the respondent Union filed one or more unfair labor charges with the Board in connection with Mr. Curcurto's termination but these charges apparently have been dismissed and no appeal has been taken to date from such determination. It is also true that the respondent claims that Alexander's is undercutting the wages of carpenters represented by the Union by paying less than the standard for carpenters work and that it is entitled to publicize this fact by picketing. There was no proof, however, to show that Aviva (which had a collective bargaining agreement with the New York District Council of Carpenters and Joiners of America, AFL-CIO, an affiliate of the respondent) was or is undercutting the wages of carpenters, and the only conceivable basis for this charge is that Alexander's was using stockmen rather than carpenters to move display tables, gondolas and other items of tangible personal property from various places in its stores to other places. All of the proof at the hearing, however, showed that this had been the standard and normal practice in every one of Alexander's stores without exception for over thirty years and no union had ever questioned the propriety of the practice. The potential harm to the respondent in the continuation of this practice in which it has apparently acquiesced from the start would accordingly appear to be minimal if not nil.
As against such minimal or lack of harm to the Union if an injunction were granted, the petitioner points out that necessary carpentry work is not being performed within the Roosevelt Field store which must be completed well in advance of the Christmas season and, if it is delayed or not completed, damages which are not easily ascertainable will inevitably result. Petitioner also has shown that the picketing has caused delays and stoppages in deliveries of merchandise to the store and alleges that it poses an imminent threat of irreparable injury because an imminent threat may exist that future deliveries will be stopped and delayed. Petitioner also asserts that the picketing has deterred at least "a small segment of [Alexander's] customers" from passing the picket line and caused employees of both Alexander's and outside contractors to refuse to perform services and that the threat of renewed refusals continues to exist and if such incidents are repeated during the Christmas season irreparable injury will result.
It is clear that if an injunction were issued, it would stabilize the situation, the status quo would be maintained, there would be little or no adverse impact on the respondent and Alexander's would be permitted to complete its necessary carpentry work for its Christmas displays and would be relieved from further interruption of deliveries and services and from the threats of irreparable injury in these and other indicated areas.
As indicated by the briefs and other papers filed herein and the testimony taken, there is little dispute as to the facts in the case. Accordingly, and since only the petitioner has filed proposed findings of fact and conclusions of law, this Court is signing the same to accompany this memorandum.
For the foregoing reasons the Court concludes that a preliminary injunction should be issued and accordingly petitioner's motion therefor is granted.
Petitioner's order has been signed.