**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**PACIFIC SOUTHWEST AIRLINES, Defendant.**

**No. C–84–0452 RFP.**

United States District Court, N.D. California.

March 29, 1984.

On Order Clarifying Scope of Preliminary Relief April 20, 1984.

Marian Halley, E.E.O.C., San Francisco, Cal., for plaintiff.

Bruce A. Gothelf, Meserve, Mumper & Hughes, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### I. FINDINGS OF FACT

Few of the facts in this employment discrimination case are disputed. The controversy began on January 3, 1984, when Pacific Southwest Airlines (PSA) notified all of its skycap employees that PSA was planning to eliminate their jobs, hire a subcontractor, and terminate their employment effective January 31, 1984. At that time, PSA employed a total of twenty-one skycaps: twelve full-time skycaps at San Francisco International Airport, seven full-time skycaps at San Diego Airport, and two part-time skycaps at San Diego Airport. All of the skycaps were black.[1] Seventeen of the full-time skycaps were over forty years old, and eleven of them were over fifty years old. The full-time skycaps averaged close to eleven years of service.

PSA paid its skycaps between $6.85 and $7.90 per hour. The skycaps also received tips and fringe benefits including health, dental, and life insurance, paid vacation, paid sick leave, and travel privileges.

On January 13, 1984, PSA informed the skycaps employed in San Francisco that it had postponed their termination until February 24, 1984. The reason for the delay was that the San Francisco Airport Commission had not yet approved a recommended change in its rules that would permit PSA and all other airlines to subcontract skycap services to the vendor of their choice. In February, PSA learned that the Commission would not make the proposed rule change until at least March 20, 1984,

---

1. At page 48 of its opposition brief, PSA contends that "while the skycap workforce consisted primarily of Black employees, it was not all black." In support of that assertion, PSA refers to Exhibit 2 to the declaration of James Sheehan, which reports the furlough of fourteen black skycaps and one white skycap. But PSA furloughed the white skycap and five of the black skycaps in September of 1983. Thus, on January 3, 1984, when PSA announced its intention to subcontract for skycap services, all of its skycaps were black.

so it further delayed the San Francisco skycap termination date to March 31, 1984.

Since January 26, 1984, nine of PSA's skycaps have filed charges of employment discrimination with the Equal Employment Opportunity Commission (EEOC). They allege that PSA's planned elimination of the entire skycap unit constituted discrimination based on race, in that no other group of employees was being similarly treated, and no other employee group was all black.

The EEOC conducted a preliminary investigation and concluded that prompt judicial action in the form of preliminary relief was necessary to carry out the purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976), and to prevent an apparent violation of Title VII. Accordingly, on January 30, 1984, it filed a petition for preliminary relief.

On January 31, 1984, five of PSA's San Diego skycaps elected to retire under the favorable conditions of a retirement program that PSA made available to all of its employees from December 1, 1983 to January 31, 1984. PSA terminated the employment of the other four San Diego skycaps.

The next day, this court heard the EEOC's petition for preliminary relief. It denied relief with respect to the San Diego skycaps, but issued a temporary restraining order prohibiting PSA from subcontracting for skycap services in San Francisco. The temporary restraining order remained in effect until Monday, February 27, 1984, when this court heard the EEOC's motion for a preliminary injunction pending completion of its investigation.

PSA has hired an unaffiliated subcontractor, PSAS, to perform skycap services at San Diego Airport. Pursuant to an agreement with PSA, PSAS offered employment to all of the San Diego skycaps who were furloughed on January 31st.[2] But PSAS pays its skycaps only $3.35 per hour and does not provide any benefits.[3]

PSA has explained that its subcontracting of San Diego skycap services and planned subcontracting of San Francisco skycap services are parts of a cost-cutting program necessitated by PSA's financial difficulties. During 1981 and 1982, PSA's airline operating losses totalled approximately twenty-seven million dollars. PSA will report an operating loss in 1983 in excess of ten million dollars. PSA's cost-cutting program, instituted in November of 1983, called for such measures as: a twenty-five percent reduction in management and non-union personnel, a severe cutback in clerical personnel, a substantial reduction in travel and entertainment expenses, an increase in the amount of severance to ease the burden of separation for long-term employees, the elimination of any planning personnel from departments other than the treasurer's office, the centralization of personnel recordkeeping, more stringent job performance evaluation for all employees, the replacement or grounding of all Boeing 727 aircraft within fourteen months, the reduction of the flight attendant complement on all aircraft from four flight attendants per aircraft to three flight attendants per aircraft, and a reduction, where operationally possible, in unionized personnel.

Between September 1, 1983 and January 31, 1984, PSA implemented comprehensive company-wide reductions in its personnel, eliminating a total of 401 employment positions. It significantly reduced the number of station agents, flight attendants, office and clerical employees, and management employees. But the only employment unit that PSA sought to replace with a subcontractor was the skycap unit.[4]

---

**2.** PSA has promised that if it subcontracts for skycap services in San Francisco, it will require the subcontractor to enter a similar agreement.

**3.** A further disadvantage of PSAS for at least one of PSA's former San Diego skycaps, Richard Price, is that PSAS would not recognize PSA seniority. Thus, although PSA did not require Price to work on Sundays, PSAS would impose

such a requirement. Because Price's religious beliefs mandate that he attend church on Sundays, he could not accept employment with PSAS.

**4.** PSA claims to have entirely eliminated its Operations and Control Department. But 64 of the 70 employees in that unit were reassigned, and

Of the 401 employees terminated, at least 10.7% (43)[5] were black. PSA's employment statistical report for June of 1983 showed, however, that only 5.75% (221) of its 3,844 employees were black.

James Sheehan, a senior vice president for PSA, has estimated that PSA will save approximately $150,000 per year through subcontracting of skycap services. He has also concluded that achieving a comparable savings through wage reductions would require a fifty-two percent reduction in wages, which would be much greater than any wage reduction PSA anticipates imposing on other employees.[6]

At his deposition, Sheehan reported that PSA subcontracts for skycap services at seventeen of its nineteen stations, San Diego Airport and San Francisco International Airport being the two exceptions. He further stated, both at his deposition and in a declaration, that, in his opinion, per-employee expenditure of management resources for skycaps was disproportionately high because PSA employed skycaps only at those two locations. In addition, at his deposition he explained that the option of subcontracting was not available with respect to most of PSA's employment units, because of union contract restrictions.

On Monday, February 27, 1984, this court heard oral argument on whether it should issue a preliminary injunction to protect PSA's San Francisco and San Diego skycaps pending completion of the EEOC's investigation of the charges against PSA, which should occur in three to four months. The EEOC requested a preliminary injunction ordering PSA to reinstate its nine former San Diego skycaps, nullify the retirements of the four San Diego skycaps who retired under threat of termination, and refrain from terminating the San Francisco skycaps, contracting out their work, or requiring them to make elections as to their employment status. This memorandum and order addresses that request.

## II. CONCLUSIONS OF LAW

The EEOC requests relief pursuant to section 706(f)(2) of Title VII, 42 U.S.C. § 2000e–5(f)(2) (1976), which provides:

> Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission ... may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure.

the work formerly performed by that unit was not subcontracted out.

PSA also claims that it has a consistent past practice of replacing entire employment units with subcontractors when necessary to save money. The only examples that it cites, however, are the elimination of approximately 100 passenger boarding inspectors (PBIs) in January of 1979, and the elimination of PSA's print shop operations in January of 1981. As the EEOC correctly points out, the PBIs were not PSA employees (they were employees of a subsidiary of PSA), and the five print shop employees who were furloughed in 1981 were, unlike the skycaps, kept on PSA's payroll for a full year after their jobs were terminated, and were given training and opportunities for reassignment during that time.

**5.** The EEOC claims in its reply brief that 59 (14.7%) of the furloughed employees were black. But it apparently obtained that number by counting the furlough of 16 black station agents twice. *See* Second Declaration of Marian Halley at Exhibit 6, page 2 (reporting the furlough of 16 black station agents, and then breaking that figure down by airport).

PSA's Summary of Reductions, *see* Declaration of James Sheehan at Exhibit 2, reports race statistics for only 344 of the 401 furloughed employees. Of the 344 employees for whom race statistics are available, 12.5% (43) were black. That suggests that approximately 12.5% of the 401 furloughed employees were black. But even if one assumes that none of the employees for whom race statistics are missing were black, a disproportionate percentage (10.7%) of the 401 employees eliminated were black.

**6.** After PSA announced its decision to terminate its skycaps, seven of the San Diego skycaps wrote to PSA's Chairman of the Board requesting a cut in pay, reduced benefits, or "whatever it takes to continue working for PSA." But PSA denied that request.

The EEOC alleges that it has conducted a preliminary investigation, that it has concluded that prompt judicial action is necessary, that the standard for granting preliminary relief under section 706(f)(2) is more relaxed than the regular standard for awarding such relief, and that the present case meets both the section 706(f)(2) standard and the regular standard. But PSA contends that the EEOC must meet the regular standard for granting preliminary relief, and that the EEOC has satisfied neither that standard nor the more relaxed standard it advocates.

### A. Standard for Awarding Relief

■ Under the regular standard for awarding preliminary relief, such relief is appropriate only if the movant demonstrates either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir.1983); *Kling v. County of Los Angeles*, 633 F.2d 876, 879 (9th Cir.1980); *Aguirre v. Chula Vista Sanitary Service & Sani-Tainer, Inc.*, 542 F.2d 779, 781 (9th Cir.1976); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1976). Thus, under both of the methods of meeting the regular standard, courts must evaluate the existence of hardship or injury and the strength of the merits of the case. The EEOC argues that judges deciding whether to grant preliminary relief under section 706(f)(2) should test neither the existence of hardship or injury nor the merits of a case as rigorously as under the regular standard.

### 1. Requirement of hardship or injury.

The EEOC relies on *EEOC v. Pacific Press Publishing Ass'n*, 535 F.2d 1182 (9th Cir.1976), for the proposition that when it seeks preliminary relief under section 706(f)(2), it need not prove that irreparable injury would occur or that the balance of hardships tips decidedly in its favor. In *Pacific Press*, an employee brought a private civil action against her employer after having filed a charge with the EEOC and received a right to sue letter from the Commission. Thereafter, the EEOC learned that the employer was retaliating against the employee for having filed a charge with the EEOC. Although the employee did not file a charge of retaliation with the EEOC, the EEOC nonetheless petitioned for a preliminary injunction enjoining the employer from discharging the employee in retaliation for having pursued her legal remedies. The district court, using the regular standard for awarding preliminary relief, issued the requested injunction pursuant to section 706(f)(2).

The Ninth Circuit, in a 2–1 decision,[7] held that the injunction was improperly granted because the EEOC had concluded its administrative process prior to the issuance of the injunction, and thus section 706(f)(2), which is expressly limited to relief pending final disposition of a charge, did not provide a basis for the injunction. The court, explaining its ruling that section 706(f)(2) did not apply because the administrative phase had terminated, stated:

A contrary holding ... cannot be reconciled with the relative ease with which [preliminary relief under section 706(f)(2) ] is procured. *Unlike the more traditional route* to preliminary injunctive relief, *the usual requirement of irreparable injury is relaxed* because of the statutory authority granted to EEOC to seek judicial relief against Title VII violations .... Furthermore, while the injunction runs to the direct benefit of the charging parties, the district court here looked to the injury to EEOC and the public interest and not to the charging parties. *This type of inquiry in effect mandates the grant of a preliminary injunctive [sic] whenever the EEOC seeks it under § 2000e–5(f)(2)* so

---

**7.** Judge Sneed dissented on the ground that the case should be remanded for determination of whether the administrative phase was suspended or actually concluded. *See* 535 F.2d at 1187.

long as its procedural requirements are met.

This is *in sharp contrast* with the burden the charging parties must assume if they seek preliminary injunctive relief in their private action. *There they must show irreparable harm* to them if the injunction did not issue. The Supreme Court has said: "[I]t seems clear that the temporary loss of income, ultimately to be recovered does not usually constitute irreparable injury." *Sampson v. Murray,* 415 U.S. 61, 90 [94 S.Ct. 937, 952, 39 L.Ed.2d 166] ... (1974). Although the Court stated that a case may arise where irreparable injury would result from the discharge of an employee, such cases are extraordinary." *Id.* at 92 n. 8 [94 S.Ct. at 953 n. 68].

*Id.* at 1187 (emphasis added). The Ninth Circuit thus forcefully asserted that a showing of irreparable injury is not required under section 706(f)(2).

PSA points out, however, that the comments in *Pacific Press* were dictum and that other courts have held that an award of preliminary relief pursuant to section 706(f)(2) requires a showing of irreparable harm. *See EEOC v. Anchor Hocking Corp.,* 666 F.2d 1037, 1041–43 (6th Cir. 1981) (holding); *EEOC v. Bay Shipbuilding Corp.,* 480 F.Supp. 925, 927–28 (E.D. Wis.1979) (holding); *EEOC v. Lockheed Electronics Co., Inc.,* 461 F.Supp. 242, 243, 244–45 (S.D.Tex.1978) (alternate basis for decision).[8] But recent Ninth Circuit dictum, especially when, as in *Pacific Press,* it is used to justify the court's holding, is likely to be a more reliable guide to what the Ninth Circuit might do than the holdings or dicta of courts outside the Ninth Circuit. Moreover, at least two district courts, including a district court within the

Ninth Circuit, have concluded that the EEOC need not meet the regular standard to obtain preliminary relief under section 706(f)(2). *See EEOC v. Credit Consultants, Inc.,* 532 F.Supp. 11, 12 (N.D.Ohio 1981); *EEOC v. Union Bank v. Arizona,* 12 FEP 527, 530 (D.Ariz.1976).

PSA also argues that "under the principle stated in *Pacific Press,* irreparable injury may be *presumed* only where *retaliation,* or at a minimum a *statutory violation,* has been *demonstrated.*" Opposition Brief at 31 (emphasis in original). But in *Pacific Press* the Ninth Circuit contrasted cases in which the EEOC seeks relief with cases in which private parties sue; it did not contrast retaliation cases brought by the EEOC and cases brought by the EEOC involving "demonstrated statutory violations" with other Title VII cases. Further, the Ninth Circuit's opinion makes clear that it knew how to distinguish between retaliation cases and other cases when it wanted to: At the end of its opinion, it asserted that "[p]reliminary injunctive relief under 42 U.S.C. § 2000e–5(f)(2) is an important tool in protecting Title VII rights, *especially in cases involving retaliation for the exercise of those rights.*" 535 F.2d at 1187 (emphasis added).

PSA further contends, however, that the legislative history of section 706(f)(2) militates against the conclusion that the EEOC need not demonstrate irreparable injury when seeking preliminary relief. The legislative history shows that the original Senate bill, S. 2515, commanded that the EEOC would have authority to bring actions for preliminary injunctions, and that Rule 65 would govern such actions. The report that accompanied the bill explained that the appropriate standard for courts to apply

---

**8.** PSA also cites *Holt v. Continental Group, Inc.,* 708 F.2d 87 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1316, 79 L.Ed.2d 712 (Feb. 21, 1984); *EEOC v. City of Janesville,* 630 F.2d 1254 (7th Cir.1980); *EEOC v. Bronson Methodist Hospital,* 489 F.Supp. 1066 (W.D.Mich.1979); and *EEOC v. Phoenix Newspapers, Inc.,* 23 FEP Cases 1726 (D.Ariz.1980). But those cases do not support its position: The plaintiff in *Holt* was not the EEOC; *Janesville* was not a Title VII case

and did not involve section 706(f)(2); the *Bronson* court expressly refrained from deciding whether the EEOC had to show irreparable injury, *see* 489 F.Supp. at 1075; and in *Phoenix Newspapers* the court found no likelihood of success on the merits, so, although it also ruled that there was no irreparable injury, it did not clarify whether a showing of irreparable injury was required.

would be to *presume irreparable injury* from the occurrence of a statutory violation. *See* S.Rep. No. 92–415, 92d Cong., 1st Sess. 21 (1971). After the bill and report were introduced, the bill was amended to, among other things, remove the reference to Rule 65. *See* 117 Cong.Rec. 39739 (1971).

Unlike the Senate bill, the House bill, H.R. 1746, provided that "no temporary restraining order or other preliminary or temporary relief shall be issued absent a showing that *substantial and irreparable injury will be unavoidable.*" 117 Cong. Rec. 31980 (1971) (emphasis added). At conference, the Senate's version was adopted, but the reference to Rule 65 was reinstated.

PSA stresses that in *EEOC v. Anchor Hocking, Corp.,* 666 F.2d 1037, 1042 (6th Cir.1981), the Sixth Circuit interpreted the legislative history of section 706(f)(2) as follows:

> The Senate, when it initially passed the bill, struck the reference to Rule 65 for the reason that such reference was viewed as inconsistent with the intention that a showing of irreparable injury would not be required. At conference, the House insisted that the requirement of a showing of irreparable injury more stringent than equity had traditionally required be included. The Senate receded as to its position that no showing of irreparable injury would be required, and the House agreed that a showing of irreparable injury to the extent that equity has traditionally required would be sufficient. This was intended to be accomplished by striking the stringent wording of the House bill and reinserting the requirement that temporary relief would be granted in accordance with Rule 65.

The Sixth Circuit's interpretation of the legislative history is plausible, but it is at least as likely, if not more likely, that the Senate agreed to include the reference to Rule 65 because it believed that Rule 65 contained no substantive standards governing the issuance of preliminary injunctions. As the Sixth Circuit itself recognized in

*Anchor Hocking,* "the rule merely sets forth procedural guidelines for seeking and obtaining an injunction and has no bearing on the substantive prerequisites to obtaining equitable relief." *Id.* at 401; *see also Factor v. United States,* 556 F.Supp. 567, 569 (D.Mass.1983); 11 C. Wright & A. Miller, Federal Practice and Procedure 364 (1973).

Support for this second interpretation of the legislative history comes from comparison of the original Senate bill with the report that accompanied that bill. The report stated that the appropriate standard was to presume irreparable injury, yet the bill itself referred to Rule 65. The logical conclusion is that reference to Rule 65 was not thought inconsistent with the idea that courts should presume the existence of irreparable injury.

Additional support for this interpretation of the legislative history derives from examination of the standard for awarding preliminary relief under sections 10(j) and (*l*) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j), (*l*). In cases brought pursuant to those sections, a relaxed statutory standard, rather than the common law standard, applies. *See, e.g., Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1189 (5th Cir.1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Samoff v. Building & Construction Trades Council of Philadelphia & Vicinity,* 475 F.2d 203, 206–07 (3d Cir. 1973); *Kennedy v. Teamsters, Local 542,* 443 F.2d 627, 629–30 (9th Cir.1971); *San Francisco Oakland Newspapers Guild v. Kennedy,* 412 F.2d 541, 544 (9th Cir.1969). As the Ninth Circuit has explained, a district court should grant preliminary relief whenever it "finds that the factual allegations and the propositions of law underlying the regional director's petition are not insubstantial and frivolous so that he has reasonable cause for believing the Act has been violated, and if the court finds that injunctive relief is appropriate." *San Francisco Oakland Newspaper Guild,* 412 F.2d at 544. "[T]he Government is not required to make a showing of irreparable

injury ...." *Internat'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. NLRB,* 449 F.2d 1046, 1051 (D.C.Cir.1971); *see also Kaynard v. Nassau District Council of Carpenters and Joiners of America, AFL–CIO,* 384 F.Supp. 1246, 1250 (E.D.N.Y.1974).

The legislative history of Title VII unequivocally shows that when Congress drafted the provisions of that Act governing the types of relief available, it modelled those provisions after the corresponding parts of the NLRA. *See Richerson v. Jones,* 551 F.2d 918, 927 (3d Cir.1977); *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant,* 491 F.2d 1364, 1377 n. 37 (5th Cir.1974); *United States v. Georgia Power Co.,* 474 F.2d 906, 921 n. 19 (5th Cir.1973); 110 Cong.Rec. 6549 (remarks of Senator Humphrey); *id.* at 7214 (memorandum of Senators Clark & Case). It is therefore not unlikely that Congress also patterned section 706(f)(2) of Title VII after the sections of the NLRA controlling the standard for awarding preliminary relief pending the Board's investigations, sections 10(j) and (*l*), and that Congress intended to incorporate a relaxed statutory standard, like that of sections 10(j) and (*l*), into section 706(f)(2).

Thus, there is support in the legislative history of Title VII for the conclusion that section 706(f)(2) does not require the EEOC to show irreparable injury to obtain preliminary relief. The legislative history is not, contrary to PSA's assertions, clearly in conflict with the approach that the EEOC advocates and that the Ninth Circuit appeared to endorse in *Pacific Press.*

A final argument that PSA makes is that there is no rationale for eliminating the irreparable injury requirement in cases that the EEOC brings under section 706(f)(2). But Congress created the EEOC to promote resolution of employment discrimination disputes through cooperation and voluntary compliance. *See Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 373, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979); *United Steelworkers of America, AFL–CIO–CLC v. Weber,* 443 U.S. 193, 211, 99 S.Ct. 2721, 2731, 61 L.Ed.2d 480 (1979); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1979); *St. John v. Employment Development Dep't,* 642 F.2d 273, 275 (9th Cir.1981).[9] Through exposure to a multitude of employment discrimination cases, the EEOC has assuredly acquired expertise in determining how best to encourage cooperation from the disputing parties. In some cases, such as the present one, it may conclude that its dispute resolution processes are likely to be irreparably injured if preliminary relief is not obtained. Courts should accord deference to such determinations, because the EEOC is in a better position than the courts to decide how a failure to grant preliminary relief will affect its dispute resolution processes. It follows that when the EEOC requests preliminary injunctive relief, courts should presume the existence of irreparable injury.

In *Anchor Hocking,* however, the Sixth Circuit protested that according deference to the EEOC's determination that injunctive relief is necessary "would amount to giving the EEOC itself the authority to determine whether injunctive relief should be granted." 666 F.2d at 1043. But that argument is unpersuasive, because according the EEOC deference in assessing irreparable injury does not amount to allowing the EEOC to decide when preliminary relief is proper. The decision of whether the EEOC has met the procedural requirements of section 706(f)(2) and, at least to some extent, *see* pp. 694–695, *infra,*

---

**9.** In *Alexander v. Gardner-Denver Co.,* the Court explained:

> Congress enacted Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin .... Cooperation and voluntary compliance were selected as the preferred means for achieving this goal. To this end, Congress created the Equal Employment Opportunity Commission ....

415 U.S. at 44, 94 S.Ct. at 1017.

whether the merits of the case are sufficiently compelling to warrant preliminary injunctive relief would still be the prerogative of the courts.

█ This court therefore concludes that the EEOC need not show irreparable injury or an imbalance of hardships to obtain preliminary injunctive relief. It further holds that that doctrine applies even when the EEOC requests a mandatory injunction rather than a prohibitory one. It is true that mandatory injunctions, such as an injunction ordering PSA to reinstate its San Diego skycaps and rescind the retirements of skycaps, are disfavored. *See Williams v. United States*, 704 F.2d 1162, 1164 (9th Cir.1983); *EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir.1980); *Anderson v. United States*, 612 F.2d 1112, 1114–15 (9th Cir.1979). But preliminary injunctions ordering reinstatement are far from unheard of. *See, e.g., Aguirre*, 542 F.2d at 780–81 (court ruled only on the standard for issuing an injunction, but obviously viewed the request for reinstatement as a proper subject for preliminary relief, because it directed that "the injunction should issue" if plaintiffs raised questions serious enough to require litigation); *EEOC v. Liberty Mutual Ins. Co.*, 475 F.2d 579, 579–80 (5th Cir.1973) (upholding preliminary injunction requiring reinstatement), *cert. denied*, 414 U.S. 854, 94 S.Ct. 152, 38 L.Ed.2d 103 (1973); *Murry v. American Standard, Inc.*, 488 F.2d 529, 530–31 (5th Cir.1973) (upholding preliminary injunction requiring reinstatement); *Truck Drivers, Oil Drivers, Filling Station & Platform Workers, Local 705, Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Almarc Mfg., Inc.*, 553 F.Supp. 1170, 1174 (N.D.Ill.1982) (issuing preliminary injunction requiring reinstatement); *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645, 654 (E.D.Pa.1979) (issuing preliminary injunction requiring reinstatement). More importantly, however, the rationale for eliminating the irreparable injury requirement applies with equal force to mandatory relief and prohibitory relief.

2. *Strength of the merits of the case.*

Although *Pacific Press* shows that demonstration of irreparable harm *is not* needed under section 706(f)(2), it does not clarify what *is* needed. In *EEOC v. Union Bank of Arizona*, 12 FEP 527, 530 (D.Ariz. 1976), which was decided before *Pacific Press*, the court concluded:

The standards for granting preliminary relief under § 706(f)(2) are established by the language of the Act itself. In this action the Plaintiff must show that:

(a) A charge of discrimination was filed with the Commission;

(b) After conducting a preliminary investigation, the Commission concluded that prompt judicial action is necessary to carry out the purposes of the Act; and

(c) A *prima facie* case that Defendant has committed or is likely to commit serious violations of the Act which will, if not enjoined, frustrate its purposes.

The EEOC urges this court to use that standard.

On the one hand, there are persuasive reasons for adopting such an approach. First, in *EEOC v. Credit Consultants, Inc.*, 532 F.Supp. 11, 12 (N.D.Ohio 1981), the court insightfully remarked that "Congress cannot have intended that traditional standards ... should be applied [under section 706(f)(2) ], inasmuch as *it is virtually impossible for the EEOC to show any likelihood of success on the merits when it has not completed its investigation* and therefore cannot have decided whether the charging party has a cause of action." (Emphasis added.) Second, the EEOC's preliminary determination that a case is meritorious may warrant deference, because the EEOC, through its involvement in countless Title VII disputes, has acquired expertise in evaluating the merits of such disputes. *See Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship & Training Committee*, 440 F.Supp. 506, 517 (N.D.Cal.1977) (explaining that the EEOC's evaluation of the case as one appropriate for immediate preliminary injunction establishes that

there is some substance to the claim), *rev'd on other grounds*, 662 F.2d 534 (9th Cir. 1981).

On the other hand, however, establishing a prima facie case in an employment discrimination case is a relatively easy matter; the difficult questions generally arise in determining whether the reason that the defendant advances for its action is a mere pretext for discrimination. *See* G. Rutherglen, Major Issues in the Federal Law of Employment Discrimination (1983), at 8–9; *see generally Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous"). Consequently, significant injustices could result from awarding preliminary relief on a showing of a prima facie case, rather than requiring demonstration of probable success on the merits or serious questions going to the merits. *See generally Anchor Hocking*, 666 F.2d at 1043 ("judicial intervention before the merits have been finally determined frequently imposes a burden on defendant that ultimately turns out to be unjustified"). Moreover, *Pacific Press* makes no mention of elimination of those traditional requirements.

But this court need not resolve these competing considerations. As explained below, it has determined that there are serious questions going to the merits of the present case. Thus, regardless of whether the EEOC must show only a prima facie case or must demonstrate probable success on the merits or serious questions going to the merits, the skycaps and the EEOC are entitled to the relief requested.

### B. *Application of Standard to Case*

In a disparate treatment case, "it is necessary to show an employer's intent to discriminate, but intent can be inferred from circumstantial evidence." *Heagney v. University of Washington*, 642 F.2d 1157, 1163 (9th Cir.1981); *see also Internat'l Brotherhood of Teamsters v. United*

*States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). "Once a plaintiff has introduced evidence from which it appears more likely than not that the defendant had an intent to discriminate, a prima facie 'treatment' case is established." *Heagney*, 642 F.2d at 1163.

■ In the present case, the EEOC has shown that the skycaps are PSA's only all-black employment unit and the only employment unit that PSA is replacing with a subcontractor. The EEOC has also presented evidence revealing that only 5.75% of PSA's employees were black, yet at least 10.7% of the employees that PSA eliminated in its cost-cutting program were black.[10] Those statistics suggest an intent to discriminate, and serve to establish a prima facie case.

Once the plaintiff in a disparate treatment case shows the existence of a prima facie case, the burden shifts to the employer to articulate a legitimate reason for the disparate treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Heagney*, 642 F.2d at 1163. The burden that shifts to the defendant upon the establishment of a prima facie case is the burden of production only; the burden of persuasion remains with the plaintiff at all times. *See Texas Dep't of Community Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094.

PSA has met its burden of production by showing that it can achieve a substantial cost savings through subcontracting for skycap services, a savings that is important to PSA because PSA is in serious financial difficulty. PSA has also presented evidence suggesting that that savings could not have been achieved through subcontracting of the services of other PSA employees, because of union contract restrictions and the disproportionately high expenditure of management resources for skycaps.

But "[i]f an employer ... articulate[s] legitimate, nondiscriminatory reasons for disparate treatment, the employee can then

---

**10.** For a discussion of the statistics, *see* note 5, *supra.*

show that those reasons were a pretext to hide bias." *Heagney*, 642 F.2d at 1163; *see also Texas Dep't of Community Affairs*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825. The evidence that the all-black skycap unit is the only employment unit that PSA plans to replace with a subcontractor, and the evidence that a disproportionate number of black employees were eliminated in PSA's recent cost reduction program raise serious questions about whether PSA's decision to subcontract for skycap services, rather than to adopt some other method of saving costs, was motivated by racial animus. Thus, the EEOC has established that there are sufficiently serious questions going to merits of this case to make them a fair ground for litigation. This court therefore concludes that the EEOC is entitled to the requested preliminary relief.

### III. CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that defendant PSA is subject to a preliminary injunction with the following terms:

1. Defendant must reinstate all nine of its former San Diego skycaps whose positions were terminated on January 31, 1984.
2. Defendant must rescind the retirements of all of its former San Diego skycaps who elected to retire under the threat of discontinued employment with defendant.
3. Defendant shall not contract out the work of its San Francisco skycaps.
4. Defendant shall not terminate the positions of any of its San Francisco skycaps.
5. Defendant shall not change the work assignment or any other terms of employment of its skycaps.

This preliminary injunction is issued pursuant to section 706(f)(2) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976), and shall remain in effect only until the EEOC completes its investigation of the skycaps' charges of racial discrimination.

SO ORDERED.

### ORDER CLARIFYING SCOPE OF PRELIMINARY RELIEF

On March 29, 1984, this court entered a preliminary injunction with the following terms:

1. Defendant Pacific Southwest Airlines must reinstate all nine of its former San Diego skycaps whose positions were terminated on January 31, 1984.
2. PSA must rescind the retirements of all of its former San Diego skycaps who elected to retire under the threat of discontinued employment with PSA.
3. PSA shall not contract out the work of its San Francisco skycaps.
4. PSA shall not terminate the positions of any of its San Francisco skycaps.
5. PSA shall not change the work assignment or any other terms of employment of its skycaps.

The court's order expressly stated that it was issued pursuant to section 706(f)(2) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976), and was to remain in effect only until the EEOC completed its investigation of the skycaps' charges of racial discrimination.

The parties have now requested clarification of the order, and have presented factual information that was not previously available to this court. The parties have identified several areas of dispute, which are discussed separately below.

1. *Whether, as a condition of reinstatement, the skycaps must agree to reimburse PSA for severance pay received at the time of termination, and, if so, on what terms.*

Between December 1, 1983 and January 31, 1984, PSA made available to all of its employees an early retirement "window." Pursuant to that window, employees could elect to take an early retirement on terms

much better than the normal ones. Several skycaps, some from San Francisco and some from San Diego, elected, in the face of impending furloughs, to take advantage of the early retirement window.[1]

As a result, each of those employees received a certain amount of severance pay from PSA. Some of them also received sums representing (1) repayment, with interest, of voluntary contributions, and (2) repayment of accrued vacation, holiday, and compensatory time hours.

The San Diego skycaps who did not choose to retire were furloughed on January 31, 1984. Most of them, like the skycaps who retired, received severance pay.

PSA now argues that, as a condition of reinstatement, the skycaps should reimburse PSA for the severance pay they received, which ranged from $2,060.80 to $3,792.00. PSA has offered to set up individualized repayment schedules for skycaps who demonstrate that they are unable to immediately repay the full amount.

The EEOC has countered that the skycaps should not be forced to return their severance pay until and unless they are permanently reinstated. It has further contended that if earlier reimbursement is ordered, the same repayment schedule should apply to all of the skycaps, to avoid undue intrusion into the privacy of the skycaps' financial affairs.

 For two reasons, the court rules that the skycaps need not presently reimburse PSA for their severance pay. First, if the skycaps ultimately lose their case, such a step would avoid unnecessary exchanges of money, because the skycaps would be entitled to retain their severance pay.

Second, if the skycaps eventually prevail on their claim, they would then be required to refund the severance money, with inter-

est. But PSA probably would be liable to the skycaps for back pay and/or damages, so it is not clear how much money the parties would have to exchange, nor even whether PSA would be liable to the skycaps or vice versa. Thus, settling accounts at this time would be premature, and, if only the skycaps were forced to pay up, unfair.

In short, then, the efficient and equitable course is to delay repayment until the merits of this lawsuit are more permanently decided.

2. *Whether the skycaps who retired during the early retirement window must forfeit the favorable retirement terms to obtain reinstatement under the preliminary injunction*

 PSA maintains that the skycaps who retired must rescind their retirements to obtain reinstatement under the preliminary injunction. It further alleges that it need not make the favorable terms of the early retirement window available to any of the skycaps at any time in the future. The net effect of those arguments is that PSA is insisting that the skycaps who retired must forfeit their favorable retirement terms as a condition of reinstatement.

Such a result probably would leave the retired skycaps in worse shape if they reap the benefits of the preliminary injunction than if they decline reinstatement. That would be unfair. The court therefore holds that PSA must reinstate the retired skycaps, and must make the terms of the early retirement window available to those skycaps if they lose in their bid for permanent reinstatement.

But PSA need not make the window terms available to the skycaps who did not retire during the window period. The fa-

---

1. It is unclear exactly how many skycaps from each airport elected to retire. PSA's brief reports that four San Francisco skycaps (Bridges, Jones, Gray, and Winford) and three San Diego skycaps (Mack, Steppe, and Price) retired. But, in a supporting declaration, PSA employee Mi-

chael Fitzgibbons refers, at page 6, to "the two (2) San Francisco skycaps who retired ..." Similarly, the EEOC's brief, at p. 4, states that five San Diego skycaps and two San Francisco skycaps retired.

vorable terms were offered for a limited time to all of PSA's employees, not just the skycaps, and the skycaps had greater, not lesser, incentives to take advantage of those terms. Thus, skycaps who passed up the opportunity during the window period should not be given a second bite at the apple.

3. *Whether the preliminary injunction should remain in effect until "final disposition" of the charges.*

The order of March 29th provided that the preliminary injunction "shall remain in effect only until the EEOC completes its investigation of the skycaps' charges of racial discrimination." But the EEOC maintains that the preliminary injunction should extend throughout the EEOC's dispute resolution process, which includes conciliation attempts and evaluation of the results of the investigation, not just the investigation process.

In so arguing, the EEOC has stressed that the language of section 706(f)(2) authorizes an injunction "pending final disposition" of the charges. It has also pointed out that in *EEOC v. Pacific Press Publishing Ass'n*, 535 F.2d 1182, 1185 (9th Cir. 1976), the Ninth Circuit explained that the "final disposition" language refers to the EEOC's administrative disposition of the case.

The EEOC clearly is correct in its view that section 706(f)(2) gives this court authority to enter a preliminary injunction lasting until the EEOC fully completes its administrative process. The more limited language in the March 29th order was purely an oversight on the court's part, and is hereby modified to extend the preliminary injunction until the EEOC has finished its dispute resolution procedure. The court, will, however, hold periodic status conferences throughout the duration of the preliminary injunction, to check on the EEOC's progress.

SO ORDERED.